# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 19, 2011

Lyle W. Cayce
Clerk

No. 09-70032

LARRY MATTHEW PUCKETT,

Petitioner-Appellant,

v.

CHRISTOPHER B. EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

Before JOLLY, SMITH, and ELROD, Circuit Judges.

PER CURIAM:

Petitioner Larry Puckett appeals the decision of the district court denying his petition for habeas relief under 28 U.S.C. § 2254. The district court granted a certificate of appealability on Puckett's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), and this court expanded the certificate to include whether the prosecution violated Puckett's due process rights by impeaching his post-*Miranda* silence. We AFFIRM.

No. 09-70032

I.

A.

jury in Mississippi convicted Larry Puckett of the capital murder of Rhonda Hatten Griffis. On the day of the murder, Rhonda's husband, David, and their two children made several trips to the home of a neighbor to gather straw for David's business. While they were gone, Rhonda's mother, Nancy Hatten, who lived on the same property as Rhonda and David in a house about 150 feet from their trailer, heard a scream and a "thud" coming from the trailer. She went inside to call Rhonda, but got no answer. As she was walking to Rhonda's trailer, she saw David and their two children pulling into the driveway.

Hatten testified that when she walked into the trailer, Puckett raised a club and started walking toward her. The club was admitted into evidence at trial and identified by one of Puckett's former employers as the handle from a broken maul that he had seen in Puckett's truck. After David and the children came through the door, Hatten took the children to her house and dialed 911. Hatten reported that there was an intruder in her daughter's home and that she had left her son-in-law with him.

After Hatten left, David asked Puckett why he was in the house. Puckett said that he had hit a deer on the road and had come for help and to use the telephone. David called for Rhonda, but she did not answer. Puckett told him that she had gone to Hatten's house. David then called 911, and told the dispatcher that there was an intruder in his house, identifying the intruder as Puckett. David saw that Puckett had a club in his hand that had blood and "white stuff" on it. When David asked him about it, Puckett said the blood was from the deer. Puckett and David started struggling, and David got the club from Puckett, swinging it and hitting Puckett on the

No. 09-70032

shoulder.  While Puckett ran away, David went to the back of the trailer to look for a gun.  He saw Rhonda on the floor with extensive injuries.

Puckett offered a different recount of the events that day.  He claimed that he went to the house to get money for his truck note.  According to Puckett, he and Rhonda had a sexual encounter the previous spring, but it had never occurred again, and they had not communicated since.  When he knocked on Rhonda's door, she let him in and led him into the den.  Rhonda told him it would be an hour and a half before David returned.  Puckett claimed that Rhonda then let him act out a fantasy in which he undressed her while he remained clothed.  After he undressed Rhonda, she saw her mother coming.  When Rhonda saw her mother walking toward the trailer, she grabbed her clothes, ran into the other room, and told Puckett to get rid of her mother.  Puckett admitted he used the club to scare Hatten.  He testified that David walked in, realized what Puckett and Rhonda were doing, and began hitting Rhonda with the club, after which he removed her clothes.  He alleged that David threatened that he would hurt Puckett's family if he ever said anything about the incident and hit Puckett with the club as he was leaving.

Puckett evaded police for two days.  The clothing he was wearing when he was captured tested negative for human blood.  There was no evidence of semen on Rhonda's body, and none of the hairs collected from Rhonda's body and the carpet where she was found matched Puckett's.  Puckett had injuries consistent with being hit on the shoulder with a club.

B.

The case was tried before a jury in Harrison County, Mississippi.  At voir dire, the prosecutor told the jury that he was going to ask them to identify themselves as falling into one of three groups: pro-death penalty, anti-death penalty, and those who fall somewhere in between.  Sixteen potential jurors responded that they had "a firm opinion in favor of the death

3

penalty when inflicted according to law." Nine potential jurors responded that they opposed the death penalty.

Before the prosecutor asked the third question, however, the attorneys and the trial judge began a lengthy discussion about the phrasing of the questions, the number of prosecution representatives allowed to participate in the questioning, and the need to make it clear to the jury that a capital trial is bifurcated into a guilt-innocence phase and a sentencing phase. After that discussion, the prosecutor asked "one last question": "Will each of you tell me that if you are selected to sit on this jury that you will listen to the evidence, take the instructions of the Court and render what you think would be a fair and impartial verdict? Is there anybody that cannot do that?" None of the potential jurors responded.

The prosecutor never asked the third question about the death penalty, and neither Gloria Hawthorne nor Harvey Wesby answered either of the first two questions. It appears that no one noticed the state's failure. After questioning concluded, the state struck Gloria Hawthorne. Hawthorne had stated on her questionnaire that "I feel if you take another person [sic] life and the Court Can [sic] prove you did it, then you Should [sic] get the death penalty." When asked to list her hobbies on the questionnaire, she said, "When Off [sic] from work I sleep half the day." The state justified its strike by saying that she "was not responsive on her questionnaire; she was one way and not responsive in open court; on her off days, she likes to sleep half the day; I don't think she would be attentive." Puckett raised a *Batson* objection, arguing that Hawthorne's alleged inattentiveness had never interfered with her employment. As to the death penalty, he argued that her answers were not inconsistent because "[the prosecutor's] question on the voir dire was whether or not they could put aside any feelings they had and view the evidence in light of the law." The court overruled Puckett's objection, saying,

4

"The Court is of the opinion that cause has been exercised without regard to race or gender and as such would not be challenged under *Batson*."

Later in the proceedings, the state struck Harvey Wesby on the basis that he too was silent during the group voir dire, as well as the fact that his juror questionnaire said, "It's okay" when asked about the death penalty, which the state characterized as "flippant." During the discussion of this objection, it appears that there was a misunderstanding about whether *Batson* challenges can be made by a white defendant such as Puckett. The court then denied Puckett's challenge, saying, "The Court is of the opinion that strike was not based along racially motivated lines and as such will not be excluded under *Batson*."

The venire for Puckett's trial consisted of 112 people, eleven of whom were black. Out of the eleven, six were excused for cause. Consequently, there were only five black potential jurors remaining prior to the exercise of peremptory challenges. The state used all twelve of its peremptory challenges, four against black jurors. The fifth black juror was so far down the list that he was never reached during the selection process. Puckett was tried by an all-white jury.

## C.

Testimony presented at trial established that, when Puckett was apprehended but before he was given his *Miranda* warning, he commented, "This is a lot of law enforcement for somebody who just committed a burglary." Puckett was later given a *Miranda* warning, after which he made a similar comment and then refused to make any further statement. Later that evening, after a second *Miranda* warning, Puckett described how he had evaded law enforcement for two days. He then added that he did not kill anyone, but had gone into the trailer to get money to pay a truck note. At

No. 09-70032

trial, although he denied saying that he was there to burglarize the Griffises, he admitted saying that he had gone there to get money.

On cross-examination, the state questioned Puckett at length about why, if he was innocent, he hid for two days instead of reporting the murder immediately. For example, the state said, "And you didn't go to anybody nowhere on this earth and say, 'Look, I want to tell you something; I just witnessed David Griffis beat his wife to death.' You didn't do that, did you?" After being asked several times, Puckett finally responded that he was afraid and trying to hide from David. The state then questioned him on his pre-*Miranda* statement that he had committed a burglary. Later, the state asked Puckett why he did not mention the murder when he was arrested and there were policemen to protect him from David. He explained that he did not tell the police then because his mother had told him not to say anything. Finally, the state asked him about his silence, emphasizing the fact that he had waited at least a month before telling anyone, and that he had first told his lawyer rather than the police.

Shortly after these questions, Puckett objected to the line of questioning, arguing that it was "getting into attorney/client relationship." The state replied, "I was trying to establish when he first told somebody—not what he told them. I have enough; I am not going further." During closing argument, the state again emphasized Puckett's silence, saying, "Puckett wants you to believe David did it, yet he ran. He ran. He hid his truck in the woods. He stayed in the woods some hundred yards from his mother's house for two days, until they finally tracked him down. He claims he never went to the house because he didn't know if his mother was home. He wouldn't stop at the Hilltop Store that Mark Hicks told you was some quarter of a mile up the road. He didn't stop there and call anybody and say, 'I just witnessed a brutal murder.' He didn't tell Sheriff Billy McGee that he witnessed a brutal

6

No. 09-70032

murder.  He simply said, 'A lot of law enforcement for breaking and entering.' . . . He waited nine months to come here and tell you. It doesn't fit, Ladies and Gentlemen.  It doesn't fit."

### D.

After hearing the evidence, the jury convicted Puckett of capital murder and sentenced him to death.  On direct appeal, the Mississippi Supreme Court found that sufficient evidence supported Puckett's conviction, but remanded the case to the trial court for a hearing on whether the jury selection process had unconstitutionally discriminated against black jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  *Puckett v. State*, 737 So. 2d 322 (Miss. 1999) (*Puckett I*).

At the evidentiary hearing, Puckett presented evidence that twenty percent of the population of Harrison County and forty percent of the voters in its First Judicial District, where Puckett was tried, were black.  Thus, the probability of selecting an entirely white jury from that population ranged from .1 percent to .6 percent.  Puckett also argued that the reasons given by the state were pretextual, noting that "the vast, vast majority of potential jurors . . . said nothing" in response to the state's questions about the death penalty.  In response, the state argued an additional basis for its strike of Hawthorne: on her questionnaire, she stated, "I feel if you take another person [sic] life and the Court Can [sic] prove you did it, then you Should [sic] get the death penalty," which the state argued reflected a misunderstanding of the burden of proof.  The state trial court first ruled that the defendant had not established a prima facie case of discrimination, and then continued, "However, I will say that had that existed, by a review of what this Court has seen, that those reasons given by the State were not racially or gender motivated reasonings . . . [H]ad this Court ruled that *Batson* did exist, that

one step further would have been a ruling by this Court that those were racially and gender neutral reasons for striking those individuals."

On its second review, the Mississippi Supreme Court recognized that the trial judge was mistaken in his understanding that Puckett could not avail himself of *Batson* because he was white.[1] *Puckett v. State*, 788 So. 2d 752, 756-57 (Miss. 2001) (*Puckett II*). The court further held that, in light of the statistical evidence Puckett presented, as well as the state's striking every available black juror, the trial court erred in finding that Puckett had not made out a prima facie case. *Id.* at 758. Nonetheless, its review of the reasons given by the state for each strike persuaded the court that they were "'neutral,' related to the particular case tried, and supported by the record." *Id.* Thus, the conviction and sentence were affirmed, with two judges dissenting.

Puckett then petitioned the Mississippi Supreme Court for post-conviction relief on other grounds, but that request was also denied. *Puckett v. State*, 879 So. 2d 920 (Miss. 2004) (*Puckett III*). Puckett filed a federal habeas petition with the district court, advancing seven grounds for relief, including both grounds presented here. The district court, Judge Halil Ozerden, denied habeas relief in a thorough, well-reasoned opinion. Puckett presents two issues on appeal: first, whether the state violated the Equal Protection Clause by using its peremptory strikes in a racially-discriminatory manner to remove all black jurors from petitioner's jury, and second, whether the state violated Puckett's due process rights by impeaching his post-*Miranda* silence. We address each issue in turn.

---

[1] Although *Batson* claims could traditionally only be brought by defendants of the same race as the excluded jurors, the Supreme Court has done away with that requirement. *Powers v. Ohio*, 499 U.S. 400, 415 (1991). The Mississippi Supreme Court was correct in its holding.

No. 09-70032

II.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal court cannot grant habeas relief unless the state court adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1)-(d)(2).  A state court's decision is contrary to clearly-established federal law within the meaning of section 2254(d)(1) when

> the state court applies a rule that contradicts the governing law set forth in our cases . . . [or] if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  On the other hand, a state court's decision is an unreasonable application of federal law if it identifies the correct legal principle but unreasonably applies it to the facts, unreasonably extends the correct principle to a new context where it should not apply, or unreasonably refuses to extend the principle to a new context where it should apply.  *Id.* at 406.  Importantly, "unreasonable" is not the same as "erroneous" or "incorrect"; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664

9

No. 09-70032

(2004)).  "If this standard is difficult to meet, that is because it was meant to be."  *Id.*

In reviewing the denial of habeas relief, we defer to the state court's factual findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  We review de novo questions of law and mixed questions of law and fact.  *Carty v. Thaler*, 583 F.3d 244, 252-53 (5th Cir. 2009).

### III.

Puckett first challenges the state's use of its peremptory strikes to remove all eligible black jurors, specifically complaining of the strikes of Gloria Hawthorne and Harvey Wesby.  The United States Supreme Court laid out a three-part test for determining whether peremptory challenges were used in a discriminatory manner in *Batson*, 476 U.S. at 96.  First, the defendant must make a prima facie showing that the prosecutor's use of peremptory challenges excluded members of a certain race from serving on the jury.  *Id.*  Second, once the defendant makes that prima facie showing, the burden shifts to the state to provide a neutral explanation for the strikes related to the particular case being tried.  *Id.* at 97.  Once the state offers an explanation for its challenges, the trial court must determine whether the defendant has established purposeful discrimination in the jury selection process.  *Id.*  The ultimate burden of persuasion stays with the defendant throughout.  *Id.* at 94 n.18; *see Rice v. Collins*, 546 U.S. 333, 338 (2006).

Both parties, as well as the district court and Mississippi Supreme Court, agree that this case turns on the third stage of the *Batson* analysis.  At this stage, the decisive question is whether the race-neutral explanations should be believed.  *See Hernandez v. New York*, 500 U.S. 352, 365 (1991).  As such, we defer to the trial court's findings on the issue of discriminatory intent because

it "largely will turn on evaluation of credibility." *Batson*, 476 U.S. at 98 n.21. For Puckett to be entitled to habeas relief under AEDPA, therefore, he must rebut the trial court's factual finding of no purposeful discrimination by clear-and-convincing evidence. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); 28 U.S.C. § 2254(d)(2).

At his evidentiary hearing on remand from the Mississippi Supreme Court, Puckett established the minute odds of seating an all-white jury where he was tried. The Mississippi Supreme Court held that such statistical improbability established a prima facie case of discrimination. We agree. For purposes of our review, however, a "side-by-side comparison[] of some black venire panelists who were struck and white panelists allowed to serve" is more important to the question of purposeful discrimination. *Reed v. Quarterman*, 555 F.3d 364, 372 (5th Cir. 2009) (quoting *Miller-El*, 545 U.S. at 241). In conducting that comparison, the court considers two factors relevant here. First, "if the State asserts that it struck a black juror with a particular characteristic, and it also accepted non-black jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination." *Id.* at 376. Second, "if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination." *Id.*

The state justified its strikes of both Hawthorne and Wesby by arguing that their questionnaire responses were inconsistent with their silence during voir dire. The trial court accepted that justification, and the Mississippi Supreme Court affirmed, holding that "it cannot be said that the trial court's finding that [Wesby's and Hawthorne's responses] to the death penalty questions on voir dire was inconsistent with the answer[s] given on [their] questionnaire[s] was clear error." *Puckett II*, 788 So. 2d at 763. Although there is an argument

to be made that Hawthorne and Wesby were waiting to respond to the third question, the questionnaire responses—Hawthorne's statement that someone "should" get the death penalty, and Wesby's statement, "It's okay"—can both be considered pro-death penalty, such that they should have responded to the state's first question. Puckett has not offered clear-and-convincing evidence to rebut the state court's finding of inconsistency. *See* 28 U.S.C. § 2254(d)(2).

Accepting that finding, we must determine, under AEDPA, whether the state court's finding of no pretext was unreasonable. 28 U.S.C. § 2254(d)(1). As the district court acknowledged, a portion of the venire did not respond to the first or second questions, including some potential white jurors who arguably would have fallen into one of those categories. However, "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). The state's failure to explore the viewpoints of similarly-situated jurors may undercut the state's professed concern about Hawthorne's ability to serve on the jury, *see Miller-El*, 545 U.S. at 244; *Stevens v. Epps*, 618 F.3d 489, 497 (5th Cir. 2010), *cert. denied*, ___ S. Ct. ___, 2011 WL 1225748 (Apr. 4, 2011), but "it does not automatically follow that absence of the questions in voir dire is indicative of pretext." *Woodward v. Epps*, 580 F.3d 318, 340 (5th Cir. 2009). It is just as likely that the failure resulted from forgetfulness after the multiple discussions and objections during voir dire as from discriminatory intent. Puckett has not rebutted by clear-and-convincing evidence the trial court's finding, after viewing the demeanor of the prosecutor and assessing his credibility, that this justification was not pretextual.

No. 09-70032

Furthermore, the state similarly challenged two white jurors because they were "totally unresponsive" during group voir dire. The typical comparison is between similarly-situated jurors who were treated differently. *Reed*, 555 F.3d at 376. We have not yet decided whether it is proper also to consider similarly-situated jurors who were treated the same. Other courts are in disagreement about this issue. *Compare United States v. Torres-Ramos*, 536 F.3d 542, 560 (6th Cir. 2008), *with Smulls v. Roper*, 535 F.3d 853, 865 (8th Cir. 2008). Nonetheless, the fact that the state struck two white jurors based on similar justifications, at the very least, tends to support the state court's finding, as the district court aptly observed.

Although we may have reached a different conclusion reviewing this issue in the first instance, Puckett has not met the high standard for habeas relief. The state court's application of *Batson* was not unreasonable, and we need not address the state's other two justifications for striking Hawthorne. *See Stevens*, 618 F.3d at 498, 500; *United States v. Brown*, 553 F.3d 768, 796 (5th Cir. 2008) (holding that defendant's pretext argument failed because the state offered another, legitimate reason for striking the prospective juror).

IV.

Puckett next challenges the state's use of his post-arrest silence during cross-examination and closing argument, which he claims violated his rights under *Doyle v. Ohio*, 426 U.S. 610 (1976).

The state first argues that habeas review of this issue is precluded because the Mississippi Supreme Court rested its ruling on a procedural bar—namely, that Puckett did not contemporaneously object to the questioning and did not raise it in his motion for new trial. To preclude habeas review, a state court's reliance on a procedural bar must be clear and express. *See Harris v. Reed*, 489 U.S. 255, 266 (1989). In making that determination, we look to "the last reasoned state-court opinion addressing [the] claim." *Matchett v. Dretke*, 380

F.3d 844, 848 (5th Cir. 2004). To avoid procedural bar, "[i]n some form, the state court has to make a fair indication that the merits of the claim were reached." *Balentine v. Thaler*, 626 F.3d 842, 854 (5th Cir. 2010).

On direct review, the Mississippi Supreme Court held that review was procedurally barred, but then held that "a review of this issue on the merits is appropriate" based on Puckett's argument that the contemporaneous-objection rule should be relaxed because the issue affected his fundamental rights. *Puckett I*, 737 So. 2d at 349. The court further held that "because Puckett did not invoke his right to silence, and made voluntary statements, the *Miranda* and *Doyle* provisions do not apply." *Id.* at 350-51. Later, on habeas review, the court characterized its holding on direct review as both a finding that consideration of the issue was barred and a holding on the merits of the appeal. *Puckett III*, 879 So. 2d at 935. It then held that reconsideration of the issue was barred by res judicata. *Id.*

The Mississippi Supreme Court's resolution of this issue does not clearly and expressly rely on a procedural bar. Because the court discussed the merits, its holding can be read either to set forth an alternative ground for affirming the conviction, or to mean that, although the claim is barred, there is an exception to that bar for claims involving the right that Puckett has asserted. Moreover, the court's holding on state habeas review that reconsideration of the issue was barred by res judicata at least implies that it was decided on the merits. *Wiley v. State*, 750 So. 2d 1193, 1200 (Miss. 1999) (cited in *Puckett III*, 879 So. 2d at 935) ("Where the merits of the issue have been considered and rejected on direct appeal, . . . the doctrine of res adjudicata applies."). Habeas review is not precluded, and we consider the merits of Puckett's claim. *See Balentine*, 626 F.3d at 854.

Due process prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings. *Doyle*, 426 U.S. at 619; *see Anderson v. Charles*,

447 U.S. 404, 407 (1980). Under *Doyle*, therefore, such silence may not be used as direct or substantive evidence of guilt. *See* 426 U.S. at 617-20. "But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." *Charles*, 447 U.S. at 408. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.*

Of course, the state's cross-examination and closing argument were improper if the state court's finding of an inconsistent statement was unreasonable under AEDPA. *See* 28 U.S.C. § 2254(d)(2). In that case, there would be nothing about which the state could cross-examine Puckett. The state court found an inconsistency between Puckett's post-arrest comment that "this is a lot of law enforcement for somebody who just committed a burglary" and his assertion at trial that he had hidden in the woods because he was scared of David Griffis after seeing him kill his wife. *Puckett I*, 737 So. 2d at 351. It concluded that the former statement suggested that Puckett had hidden because he committed a burglary, while the latter suggested that he hid because he was afraid of David. We have held that "where post-arrest and trial statements involve the same subject matter and where the post-arrest statement is sufficiently incomplete as to be 'arguably inconsistent,'. . . *Charles* applies and comment upon the omissions is permitted." *Pitts v. Anderson*, 122 F.3d 275, 281 (5th Cir. 1997). In the present case, the two statements dealt with the same subject matter—why Puckett hid in the woods. Moreover, the post-arrest statement was incomplete because it did not mention his fear of David. Puckett has not rebutted that factual finding by clear-and-convincing evidence, as he must under AEDPA.

The Mississippi Supreme Court further found that the state's questions were based on that inconsistency and therefore permissible. The question is

whether the state's cross-examination and closing argument were "designed to draw meaning from silence, [or] to elicit an explanation for a prior inconsistent statement." *Charles*, 447 U.S. at 409; *see White v. Thaler*, 610 F.3d 890, 903 (5th Cir. 2010). If the cross-examination is "either intended to or [has] the necessary effect of raising a negative inference simply because of the defendant's exercise of his right to remain silent," the questions are prohibited. *Pitts*, 122 F.3d at 280. Here, the line of questioning challenged by Puckett began with questions about why Puckett did not report the murder immediately after it occurred. Such questioning about pre-*Miranda* silence is permissible. *See Jenkins v. Anderson*, 447 U.S. 231, 240 (1980). The state then questioned Puckett about his statement that it was "a lot of law enforcement for somebody who had just committed a burglary" in an attempt to contradict Puckett's statement that he did not report the murder due to his fear of Griffis: "I mean, helicopters, dogs, all the protection in the world from David Griffis, wasn't it?" The state continued by asking Puckett whom he first told about the murder and when. Although the questioning about when Puckett finally told his story may be suspect, viewing the cross-examination in its entirety, the state court's finding that the prosecutor's intent was to elicit an explanation for a prior inconsistent statement was not unreasonable. *See* 28 U.S.C. § 2254(d)(1).

Likewise, the closing argument relied almost exclusively on Puckett's pre-arrest behavior, noting that he failed to tell his mother or anyone else about the murder during the two days in which he was running from the police. As mentioned above, such pre-arrest silence is not entitled to protection. *See Jenkins*, 447 U.S. at 240. Although the state mentioned Puckett's failure to tell the police about the murder when he was arrested, the state court's finding about the prosecutor's intent was not unreasonable. *See Pitts*, 122 F.3d at 281; 28 U.S.C. § 2254(d)(1).

No. 09-70032

In sum, the Mississippi Supreme Court did not unreasonably apply *Doyle* in finding that the state's questions were permissible.

V.

For the reasons set forth above, we AFFIRM the district court's judgment denying habeas relief.