# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 29, 2021

Lyle W. Cayce
Clerk

No. 18-70034

Ker'sean Olajuwa Ramey,

*Petitioner—Appellant*,

*versus*

Bobby Lumpkin, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 6:13-CV-43

Before Smith, Higginson, and Duncan, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

A Texas jury found Ker'sean Olajuwa Ramey guilty of capital murder and imposed the death penalty for his role in the murders of Celso Lopez, Tiffani Peacock, and Sam Roberts. Ramey challenged his conviction and sentence both on direct appeal and through state habeas proceedings, but the Texas courts denied his requests for relief. The United States District Court for the Southern District of Texas again rejected Ramey's claims for relief and his request for a certificate of appealability ("COA"). This court granted Ramey's application for a COA on two issues: (1) whether Ramey's trial was

No. 18-70034

tainted by the exclusion of black jurors (the "*Batson* Claim"), and (2) whether trial counsel rendered unconstitutionally ineffective assistance before trial and during the guilt phase of trial by failing to conduct an adequate investigation (the "*Strickland* Claim"). *Ramey v. Davis*, 942 F.3d 241, 246 (5th Cir. 2019). For the reasons articulated herein, we AFFIRM the district court's denial of Ramey's habeas petition.

## I.

## A.

Other courts have detailed the facts of this case, *see Ramey v. Davis*, 314 F. Supp. 3d 785 (S.D. Tex. 2018); *Ramey v. State*, No. AP-75,678, 2009 WL 335276 (Tex. Crim. App. Feb. 11, 2009), but we repeat the critical ones here for completeness.

On August 25, 2005, the bodies of Celso Lopez, Tiffani Peacock, and Sam Roberts were found at Roberts's home. They each had been shot multiple times. The Texas Department of Public Safety Crime Unit ("DPS") collected fingerprints and other items from the scene. This physical evidence yielded no immediate suspects.

In November 2005, investigators received an anonymous tip implicating Ramey, LeJames Norman,[1] and two others in the crime. Investigators interrogated Ramey on December 12, 2005, at a Texas detention center where he was being held on unrelated charges. Ramey did not confess to the crimes and was arrested for capital murder.

---

[1] Norman pleaded guilty for his role in the triple murder, and a jury sentenced him to death. *Norman v. Stephens*, 817 F.3d 226, 228 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1201 (2017).

No. 18-70034

At trial, the State presented testimony from numerous witnesses. The trial evidence showed that, a few days before the shooting, Ramey and others broke into the home of a neighbor, Kenneth Nairn, to steal weapons. The group stole approximately 25 guns and ammunition.

Norman testified that, soon after the Nairn burglary, he and Ramey decided to rob the home of his neighbor, Sam Roberts, because Norman believed that Roberts had at least a kilogram of cocaine at his residence. In preparation for the robbery, Norman testified that Ramey agreed to carry a short-barrel Harrington & Richardson .22 revolver, and Norman agreed to carry a long-barrel Rohm Gesellschaft .22 revolver. Both weapons originated from the Nairn burglary.

Norman testified that, on the day of the triple homicide, Norman and Ramey entered Roberts's apartment and they fatally shot Celso Lopez, Tiffani Peacock, and Sam Roberts—with Ramey shooting Roberts twice and Lopez once, and Norman shooting Lopez once, Peacock once, and Roberts three times. The pair fled back to Norman's house, which was across the street. Upon realizing they had left a police scanner at the crime scene, Ramey returned to retrieve it. According to Norman, while inside the house, Ramey shot Peacock once and shot Lopez three times. The State's ballistic expert gave testimony consistent with Norman's account, testifying that a Harrington & Richardson revolver was used to shoot Roberts twice, Lopez three times, and Peacock once, while a Rohm Gesellschaft revolver was used to shoot Roberts three times, Lopez once, and Peacock once.

The next day, Roberts's mother and father discovered their son's, Peacock's, and Lopez's bodies. Ramey and Norman watched from Norman's front porch as law enforcement investigated the crime scene. Norman testified that Ramey disposed of the weapons used in the crime by throwing them off the edge of a local dam. Ramey's former girlfriend, Stacey

No. 18-70034

Johnson, testified that she drove Ramey to the dam three days after the murders and accompanied him while he disposed of two revolvers. During the drive home from the dam, Johnson testified that Ramey told her about the murders and threatened to kill her if she revealed his role in the murders to police. Four months later, Johnson led investigators to the dam and indicated to law enforcement precisely where Ramey had thrown the weapons. A dive team recovered both weapons. Other weapons from the Nairn burglary were found hidden under floorboards at Ramey's house.

Although the State presented extensive testimonial evidence, there was no physical evidence—fingerprints, DNA, blood, or hair samples—connecting Ramey to the crime scene or either of the alleged murder weapons recovered from the dam. Further, the DPS firearm examiner was unable to determine conclusively whether any of the bullets recovered from the victims and crime scene had been fired by the alleged murder weapons.

## B.

On December 17, 2005, the State of Texas indicted Ramey for capital murder and burglary of a habitation. Ramey pleaded not guilty to both offenses and the case proceeded to trial.

Voir dire lasted more than a month, from October 30, 2006 to December 14, 2006. To select a jury, the parties cycled through two venire panels totaling 184 people. The first venire panel contained seven black venire members. However, none of these venire members was selected as jurors: the State challenged five for cause, and two were excused because of their biological relationship to Ramey. After one month of voir dire and after exhausting one venire panel, the parties had selected eleven jurors and needed three more. The eleven jurors included ten white people and one Hispanic person.

4

No. 18-70034

A second venire panel consisting of 49 venire members was called on December 4, 2006. When the venire panel was first seated, four of the first ten venire members would have been black. However, the State requested a jury shuffle before the venire members began answering any questions. Defense counsel requested a race-neutral reason for the State's shuffle, and the State explained that "the overwhelming majority of the folks that . . . would be good State's jurors were towards the back of the panel." Defense counsel did not pursue the objection further. After the shuffle, there were two black venire members among the first dozen to be questioned.

The first black venire member to be questioned was Cheryl Steadham-Scott. During voir dire, Steadham-Scott expressed what might be described as confusion, ambivalence, or reservation concerning the death penalty. Steadham-Scott was also asked a variety of race-specific questions, including her perception of the guilt or innocence of numerous famous black people. The State ultimately used a peremptory strike to remove her—the subject of Ramey's *Batson* Claim. At the time of the strike, no objection was registered. Ramey's trial counsel did object to the State's peremptory strike of Steadham-Scott the following court day, which was three weeks after the strike was exercised, but before the jury was sworn.[2] When challenged, the prosecutor's proffered reason for striking Steadham-Scott was that "her questionnaire clearly indicated that she could not impose the death penalty." In the end, there were no black people on Ramey's jury.

On January 16, 2017, after a four-day trial, the jury found Ramey guilty of capital murder after deliberating for just over an hour. Following the sentencing phase of the trial, and after deliberating for about 15 minutes, the

---

[2] The Christmas and New Year holidays intervened.

No. 18-70034

jury answered Texas's special issue questions in a manner requiring imposition of the death penalty.

C.

Ramey, through the same counsel who represented him at trial, appealed directly to the Texas Court of Criminal Appeals ("TCCA"). In that appeal, the TCCA rejected Ramey's *Batson* claim with respect to the jury shuffle because the State provided a race-neutral reason for the shuffle. *Ramey*, 2009 WL 335276, at *1–3. The court also rejected Ramey's *Batson* claim with respect to Steadham-Scott because it credited the State's race-neutral reason for striking her. *Id.* at *3 ("[T]he record supports the trial court's ruling that the State struck Steadham-Scott because of her inconclusive opinions on the death penalty and not her identity as an African–American."). On direct appeal, Ramey did not claim ineffective assistance of counsel. The TCCA rejected Ramey's remaining claims on direct appeal and affirmed Ramey's conviction and sentence. *Id.* Ramey's petition for a writ of certiorari to the U.S. Supreme Court was denied. *Ramey v. Texas*, 558 U.S. 836 (2009).

Through separate, appointed counsel, Ramey also filed a state application for a writ of habeas corpus. The same judge who presided over Ramey's trial sat as a habeas reviewer and made habeas recommendations to the TCCA. In his habeas application, Ramey raised twenty-two claims, including that the jury selection process violated *Batson* (claims 13 and 14) and that trial counsel was constitutionally ineffective during voir dire and during the punishment phase (claims 15 and 16).[3] The judge entered an order

---

[3] At the state habeas stage, Ramey did not raise the *Strickland* Claim that he now raises, which is that trial counsel was constitutionally ineffective before trial and during the guilt phase by failing to conduct an adequate investigation.

recommending that the TCCA deny habeas relief.  With respect to Ramey's *Batson* claim, the judge concluded that the State's use of the jury shuffle and peremptory strike of Steadham-Scott were not racially motivated and, in the alternative, that the *Batson* claim had been "waived" because Ramey "fail[ed] to object" immediately.  The TCCA denied Ramey's request for habeas relief.  *Ex parte Ramey*, 382 S.W.3d 396, 398 (Tex. Crim. App. 2012).

Ramey subsequently filed a federal petition for a writ of habeas corpus that listed five claims and "incorporate[d] into his claims for relief the claims filed in his direct appeal brief and in his state habeas application."  After his initial federal habeas counsel withdrew and new federal habeas counsel was appointed, Ramey amended his filing, raising six additional claims.  The district court denied relief and denied a COA in a lengthy opinion.  *Ramey*, 314 F. Supp. 3d at 831–32.

With respect to Ramey's *Batson* Claim, the district court found that the State's use of its peremptory strike on Steadham-Scott was the result of "serious concerns about [her] ability to impose the correct burden on the future-dangerousness issue" for imposing the death penalty, not her "identity as an African-American."  *Id.* at 804–07.  With respect to Ramey's guilt-phase *Strickland* Claim, the district court held the claim was procedurally defaulted because Ramey did not raise it in state habeas proceedings.  *Id.* at 822–23.  The district court also concluded that Ramey's state habeas counsel's failure to (or decision not to) raise the claim did not satisfy the cause-and-prejudice standard.  *Id.*  The district court opined that the underlying claim was weak.  *Id.* at 823–25 & n.24.  Accordingly, the district court entered final judgment dismissing Ramey's claims with prejudice.  Ramey then filed a post-judgment Rule 59(e) motion, which the district denied.  Ramey timely applied to this court for a COA on three issues, and this court granted Ramey's application as to two issues: (1) whether Ramey's trial was tainted by the exclusion of black jurors (the "*Batson*

Claim"); (2) whether trial counsel rendered unconstitutionally ineffective assistance before trial and during the guilt phase of trial by failing to conduct an adequate investigation (the "*Strickland* Claim"). *Ramey*, 942 F.3d at 246.

## II.

We first consider Ramey's *Batson* Claim.  He argues that an unconstitutional and discriminatory jury selection process tainted his trial. He contends that the State's peremptory strike of Cheryl Steadham-Scott was a violation of the Equal Protection Clause.  *See* U.S. Const. amend. XIV, § 1.

## A.

Ramey's *Batson* Claim is subject to the deferential standard set out in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because it was adjudicated by Texas courts on the merits.  28 U.S.C. § 2254(d).  Under that standard, also known as the relitigation bar, we may grant habeas relief only if the Texas courts' adjudication of Ramey's *Batson* Claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*.; *Dale v. Quarterman*, 553 F.3d 876, 879 (5th Cir. 2008).

A state court's decision is contrary to clearly established precedent if it "contradicts the governing law set forth in [the Supreme Court's] cases" or if the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court yet reaches a different result.  *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (alteration in original) (quoting *Wallace v. Quarterman*, 516 F.3d 351, 354 (5th Cir. 2008)).  If fair-minded jurists could disagree about whether the state court's decision was correct, deference under AEDPA precludes federal habeas relief.  § 2254(d)(1); *see*

*also Harrington v. Richter*, 562 U.S. 86, 101 (2011). In a habeas appeal, this court reviews legal conclusions de novo and factual findings for clear error. *Perez v. Cain*, 529 F.3d 588, 593 (5th Cir. 2008). This court presumes the state court's factual findings are correct unless rebutted with clear and convincing evidence. *Wooten*, 598 F.3d at 218.

## B.

Before addressing the merits of Ramey's *Batson* Claim, we first reject Texas's procedural default, abandonment, and waiver arguments.

Texas first argues that Ramey's *Batson* Claim is procedurally defaulted because he failed to contemporaneously object to the State's strike of Steadham-Scott before the state trial court judge. This argument fails because Ramey's *Batson* challenge was timely under Texas law. In Texas, a *Batson* challenge must be raised "before the court has impanelled the jury." TEX. CODE CRIM. PROC. art. 35.261(a). In Texas, "[a] jury is considered impaneled when the members of the jury have been both selected and sworn." *Heard v. State*, 887 S.W.2d 94, 99 (Tex. App. 1994). Thus, in Texas, "[b]y objecting before the jury [i]s sworn, [a defendant] timely raise[s] the *Batson* issue." *Brown v. State*, 56 S.W.3d 915, 918 (Tex. App. 2001); *Hill v. State*, 827 S.W.2d 860, 862–65 (Tex. Crim. App. 1992). The record indisputably reflects that Ramey raised his *Batson* objection before the jury was sworn in. Ramey complied with Texas's procedural rule for registering a timely *Batson* objection and, thus, there is no procedural default.

Next, Texas argues in a footnote that Ramey abandoned his *Batson* Claim immediately after making his objection. Texas notes that, after the prosecutor provided purportedly race-neutral reasons for striking Steadham-Scott, the trial court stated, "I'm comfortable with the record reflecting what it did with respect to that juror at this time." Ramey's counsel responded, "Yes, sir, yes, sir," and when the trial court judge asked if Ramey's counsel

had "[a]nything else," Ramey's counsel responded, "No, sir."   Texas argues that this constituted an abandonment of Ramey's *Batson* Claim because Ramey's counsel made no effort to show that the prosecutor's proffered reasons for striking Steadham-Scott were pretextual.  Texas did not argue before the district court—or any other court—that Ramey's *Batson* Claim was abandoned at the trial court.  Further, the state habeas court did not rely on this reasoning to reject Ramey's *Batson* Claim.  We decline to find abandonment.

Finally, Texas argues that Ramey has forfeited any argument that his *Batson* Claim can surmount AEDPA's relitigation bar.  Texas contends that Ramey's briefing completely disregards the relitigation bar and "reads like a normal appeal on direct review."  We reject this argument because, as Texas acknowledges elsewhere, Ramey's briefing explicitly recognizes that his *Batson* Claim must surmount the relitigation bar.  As Ramey notes, portions of his appellate briefing *do* read as if his arguments are being made on direct review because, if this court determines that he has surmounted the relitigation bar, this court will review his *Batson* Claim de novo.  *Johnson v. Williams*, 568 U.S. 289, 303 (2013); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

## C.

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose."  *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019).  Claims challenging the use of race-based peremptory strikes require the application of *Batson*'s three-step test.  A defendant must first make a prima facie case that race motivated the challenged strikes.  *Batson v. Kentucky*, 476 U.S. 79, 96–97 (1986).  If the defendant carries this burden, the prosecutor must provide race-neutral reasons for the challenged strikes.  *Id.*

at 97–98.  Finally, at step three, the court considers whether the defendant has carried his burden of proving purposeful discrimination.  *Id.* at 98.

Under AEDPA, we may grant habeas relief, as relevant, only if the state habeas court's adjudication of Ramey's *Batson* Claim "'resulted in a decision that . . . involved an unreasonable application' of the relevant law." *Panetti*, 551 U.S. at 953 (alteration in original) (quoting § 2254(d)(1)).  "A state court's decision constitutes an unreasonable application of clearly established federal law if it is 'objectively unreasonable.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)).  "The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Ramey presents two primary arguments about why the state habeas court's adjudication clears AEDPA's relitigation bar.

First, Ramey argues that the state habeas court unreasonably applied clearly established federal law by considering justifications for the peremptory strike of Steadham-Scott that were never articulated at the trial court.  Ramey notes that while the prosecutor's proffered reason for striking Steadham-Scott was because "her questionnaire clearly indicated that she could not impose the death penalty," the state habeas court concluded Steadham-Scott was struck because of her "inconclusive opinions on the death penalty."  A reviewing court is not allowed to supply its own justifications for the striking of a particular juror when the prosecutor did not articulate that justification before the trial court. *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) ("*Miller-El II*"); *Chamberlin v. Fisher*, 885 F.3d 832, 841 (5th Cir. 2018) (en banc).  But here, the state habeas court characterized the prosecutor's stated reason for striking Steadham-Scott only slightly

differently from the prosecutor's verbatim stated reason; it did not alter the basic reason the prosecutor gave for striking Steadham-Scott. This is not an unreasonable application of federal law, and this argument is insufficient to surmount AEDPA's relitigation bar.

Second, Ramey argues that the state habeas court unreasonably applied federal law because it failed to account for all relevant facts and circumstances when assessing whether the State's strike of Steadham-Scott was pretextual. Specifically, Ramey points to one juror who he contends expressed ambivalence or uncertainty about imposing the death penalty in her juror questionnaire similar to that expressed by Steadham-Scott—Carol Laza, a white juror.

At *Batson*'s third step, courts are generally required to consider the State's race-neutral explanations "in light of all of the relevant facts and circumstances." *Flowers*, 139 S. Ct. at 2243. The Supreme Court has identified circumstances that may bear on a *Batson* challenge: (1) a "side-by-side" comparison of a black venire member who was struck and a white venire member who was seated; (2) the ultimate racial composition of the jury; (3) statistical significance of peremptorily stricken venire members; (4) disparate questioning of black venire members; and (5) the State's use of a jury shuffle. *Miller-El II*, 545 U.S. at 241–53. The last state court to consider Ramey's claim did not undertake this analysis. Indeed, the record reflects that no state court has ever considered the full panoply of facts and circumstances when analyzing Ramey's *Batson* Claim.

But that does not render the state habeas court's decision contrary to clearly established federal law or an unreasonable application of it. This is because Ramey did not direct the state courts to what he now asserts are relevant facts and circumstances. Ramey cannot identify clearly established federal law requiring state courts *sua sponte* to find and resolve all facts and

circumstances that may bear on whether a peremptory strike was pretextual and racially motivated when those facts and circumstances were not identified and urged by the strike's challenger.

Although the Supreme Court in *Miller-El II* conducted a comparative juror analysis for the first time on appeal, 545 U.S. at 241 nn.1 & 2, and the Court did the same in *Flowers*, albeit in a case beyond the strictures of AEDPA, 139 S. Ct. at 2249–50, it is not clearly established that habeas courts *must*, of their own accord, uncover and resolve all facts and circumstances that may bear on whether a peremptory strike was racially motivated when the strike's challenger has not identified those facts and circumstances. Indeed, in *Chamberlin v. Fisher*, this court sitting en banc held that "*Miller-El II* did not clearly establish any *requirement* that a state court conduct a comparative juror analysis at all, let alone *sua sponte*." 885 F.3d at 838. "This is especially true where, as here, the defendant never sought a comparative juror analysis." *Id.* at 839. *Chamberlin* reversed the district court for embracing the rule that a state habeas court's "decision not to conduct a comparative juror analysis [*sua sponte*] violated . . . 'clearly established law.'" *Id.* at 838.

As noted, Ramey did not direct the state habeas court to specific portions of the record suggesting evidence of pretext and racial bias. Ramey's state habeas claims *did* broadly note that the "facts and circumstances" surrounding a peremptory challenge can "suggest[] that the exclusion was racially motivated." Ramey also focused the state habeas court's attention on the State's jury shuffle by including it as a separate claim in his state habeas petition. But Ramey did not specifically assert the facts and circumstances that would bear on whether the peremptory strike of Steadham-Scott was racially motivated. Further, this court has observed that, for the relevant time period, "no case law indicated that *Batson* applied to an allegedly discriminatory jury shuffle," and the TCCA has "refused to

extend *Batson* to jury shuffles." *Blanton v. Quarterman*, 543 F.3d 230, 241–242 (5th Cir. 2008). Because Ramey cannot identify clearly established federal law requiring state courts *sua sponte* to find and consider all facts and circumstances that may bear on whether a peremptory strike was racially motivated when those facts and circumstances were not identified by the strike's challenger, this argument is insufficient to surmount AEDPA's relitigation bar, and we are unable to grant relief on Ramey's *Batson* Claim.

## III.

We next consider Ramey's *Strickland* Claim. In his federal habeas application, Ramey argued for the first time that his Trial Counsel[4] was constitutionally ineffective during pre-trial investigation and during the guilt-innocence phase of the trial. Specifically, Ramey alleges that his Trial Counsel engaged in no independent pre-trial investigation, which Ramey argues would have yielded impeachment material of the State's witnesses.

## A.

Ramey did not present his *Strickland* Claim in state court. Nor can he now—the TCCA would apply its abuse-of-the-writ doctrine to prohibit Ramey from raising his unexhausted *Strickland* Claim in a successive state habeas application, an adequate and independent state ground. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *abrogated in part on other grounds by Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Canales v. Stephens*, 765 F.3d 551, 566 (5th Cir. 2014). Ramey's claim is thus procedurally defaulted, *see Canales*, 765 F.3d at 566, and therefore not subject to the strictures of AEDPA, which requires an adjudication on the merits, *see* 28 U.S.C. § 2254(d). We pretermit whether Ramey can overcome the procedural default by

---

[4] Ramey was represented at trial by Dr. Joseph Rutherford Willie, II, D.D.S., J.D. and Mr. James Donald Evans, III (collectively, "Trial Counsel").

demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law," *Coleman*, 501 U.S. at 750, and we instead "cut straight to the merits to deny his claim," *Murphy v. Davis*, 901 F.3d 578, 589 n.4 (5th Cir. 2018).  We review the district court's conclusions of law de novo and factual findings for clear error.  *Id*. at 590.

### B.

To warrant relief, Ramey must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Proving deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.  Proving prejudice requires that Ramey show a "reasonable probability"—"a probability sufficient to undermine confidence in the outcome"—that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694; *see also Adekeye v. Davis*, 938 F.3d 678, 683 (5th Cir. 2019) (prejudice requires showing that "it was 'reasonably likely' the jury *would* have reached a different result, not merely that it *could* have reached a different result").  When assessing prejudice, this court must "evaluate the totality of the available . . . evidence," including "evidence adduced in the habeas proceeding."  *See Williams v. Taylor*, 529 U.S. 362, 397 (2000).

Ramey asserts that Trial Counsel's performance was deficient because they did not conduct any pre-trial investigation of the State's case against Ramey.  He argues that this deficient performance prejudiced him because proper investigation would have yielded valuable impeachment material of the State's witnesses, which was particularly important because the State built its case against Ramey around testimony rather than physical evidence.

No. 18-70034

Indeed, the State's ballistics expert admitted that he could not say the guns recovered from the dam were the same guns used in the murders. The ballistics expert also could not say who fired the guns. Further, there was no physical evidence connecting Ramey to the crime scene. In the absence of physical evidence, the State relied on testimony from an array of witnesses to incriminate Ramey, many of whom, Ramey argues, Trial Counsel failed to properly investigate and then impeach.

We do not decide whether Ramey's Trial Counsel was deficient because we find that Ramey cannot meet his burden to show prejudice—that is, he has not shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Trevino v. Davis*, 861 F.3d 545, 549 (5th Cir. 2017). Although some of the witnesses presented by the State posed credibility issues that, according to Ramey, Trial Counsel could have exposed through proper investigation and impeachment, the parties do not dispute that other witness testimony was unaffected by alleged investigative error committed by Trial Counsel.

Indeed, the district court found that Ramey had not shown prejudice because the "witnesses whose testimony is unaffected by his federal claims provided testimony [that] put[] the events into a highly incriminating context" and "show [Ramey's] involvement in the crime." *Ramey*, 314 F. Supp. 3d at 824–25. We agree. This "unaffected" circumstantial evidence of Ramey's crime—including Ramey's direct confession—is overwhelming.[5]

---

[5] The district court painstakingly parsed government witnesses, highlighting incriminating testimony that would be unaffected by allegations of deficient trial investigation. *Ramey v. Davis*, 314 F. Supp. 3d at 824–25. These witnesses included Lonny Lyte (Ramey's stepfather), Courtney Hardaway (Ramey's former girlfriend and his

Notably, the testimony of Stacey Johnson, which the parties do not dispute is unaffected by Trial Counsel's alleged errors, is particularly damaging. Johnson, Ramey's former girlfriend, told the jury that Ramey admitted his involvement in the triple murder and that she assisted Ramey in disposing of the purported murder weapons. She testified that on August 27, 2005, Ramey called her and asked if she would drive him to a location with running water. Johnson agreed to take Ramey to a local dam. Johnson testified that during the drive, Ramey spoke on the phone with his stepfather, Lonny Lyte. Once they arrived at the dam, Johnson saw Ramey wipe off two pistols and throw them into the water. Johnson remembered precisely where Ramey disposed of the pistols and led investigators there to retrieve them four months later. Johnson testified that, during the drive home from the dam, Ramey admitted that the guns she watched him toss into the water were the same guns used in the triple murder. Once the pair arrived at Johnson's home, Ramey explained in detail how the triple murder played out. Johnson testified that Ramey admitted to shooting Lopez, Peacock, and Roberts. After telling Johnson about the triple murder, Ramey told Johnson he would kill her if she spoke to the police. Finally, Johnson testified that Ramey told her he stole the pistols used in the triple murder during the Nairn burglary.

Johnson provided the jury with facts that interlocked with and bolstered the testimony of numerous other witnesses, including other witnesses unaffected by Trial Counsel's alleged ineffectiveness. For example, her testimony is consistent with Lyte's testimony, which Ramey does not dispute is also unaffected by alleged pretrial investigative error that Trial Counsel committed. Lyte testified that, on August 27, 2005, Ramey

---

children's mother), Bradford Butler (Ramey's cousin), and Stacey Johnson (Ramey's former girlfriend). *Id*. We agree and elaborate above the prominent testimony of Stacey Johnson.

called him to ask: "If you was to kill somebody what would you do with the guns?" Lyte recommended throwing the guns in a river.

Ramey attempts to downplay Johnson's testimony by noting that her description of the guns Ramey threw into the water did not match the guns recovered by the dive team. This factual discrepancy does not negate Ramey's damaging admissions to Johnson. Ramey's other attempts to undermine Johnson's testimony also fail: (1) Ramey faults the State for seeking to elicit hearsay testimony from Johnson, but Trial Counsel objected to such testimony and the trial judge sustained the objection; (2) Ramey contends the State used leading questions to elicit testimony, but most of Johnson's testimony was not the result of leading questions; (3) Ramey complains that the State refreshed Johnson's recollection using her voluntary statement to police, but that tended to make her testimony more reliable because it was derived from a written record; and (4) Ramey states that Johnson had an "obvious motive to testify" against him, namely a feud with Ramey's new girlfriend—but the jury was made aware of this fact during cross-examination, and it seems improbable that, as a result of a domestic dispute, Johnson would be willing to testify against her ex-boyfriend, a man who had threatened to take her life if she spoke to the police, in a capital murder trial where his life was on the line. Lastly, Ramey asserts that Johnson's testimony was "contradicted by" Norman's testimony because, while Johnson testified that Ramey told her he shot all three victims, Norman testified that Norman shot at least one of the victims. But the statements are not inconsistent—it is possible that both Ramey and Norman shot the same victim at least once each.

Although some of the witnesses presented by the State posed potential credibility issues, the remaining and unaffected witness testimony, above all that of Stacey Johnson, assures us that those credibility issues do not

"undermine confidence in the outcome" of the trial.  *Trevino*, 861 F.3d at 549.  For that reason, we do not grant relief on Ramey's *Strickland* Claim.

## IV.

For the foregoing reasons, we AFFIRM the district court's denial of Ramey's habeas petition.